1   Michael R. Lozeau (SBN 142893)
    Douglas J. Chermak (SBN 233382)
2   Lozeau Drury LLP
    1516 Oak Street, Suite 216
3   Alameda, CA 94501
    Telephone:    510 749 9102
4   Facsimile:     510 749 9103
    Email:          michael@lozeaudrury.com
5
    Andrew L. Packard (SBN 168690)
6   Law Offices of Andrew L. Packard
    319 Pleasant Street
7   Petaluma, CA 94952
    Telephone:    707 763 7227
8   Facsimile:     415 763 9227
    Email:          andrew@packardlawoffices.com
9
    Attorneys for Plaintiff
10  California Sportfishing Protection Alliance

11  John Lynn Smith (SBN 154657)
    Email: jlsmith@reedsmith.com
12  Julia C. Butler (SBN 199133)
    Email: jbutler@reedsmith.com
13  REED SMITH LLP
    1999 Harrison Street, Suite 2400
14  Oakland, CA 94612-3572
    **Mailing Address:**
15  P.O. Box 2084
    Oakland, CA 94604-2084
16
    Telephone:    +1 510 763 2000
17  Facsimile:     +1 510 273 8832

18  Attorneys for Defendant
    Waste Management of California, Inc.

19                UNITED STATES DISTRICT COURT

20              EASTERN DISTRICT OF CALIFORNIA

21
    CALIFORNIA SPORTFISHING PROTECTION          No.: 2:08-CV-02179-FCD-KJM
22  ALLIANCE,
                                                 **CONSENT DECREE**
23                  Plaintiff,
                                                 Honorable Frank C. Damrell, Jr.
24          vs.

25  WASTE MANAGEMENT OF CALIFORNIA,
    INC.,
26
                    Defendant.
27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## A. BACKGROUND

1. California Sportfishing Protection Alliance ("CSPA") is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the Mokelumne River, San Joaquin River, the Sacramento-San Joaquin Delta, and other California waters. Bill Jennings is the Chairperson of CSPA and a member of CSPA.

2. Waste Management of California, Inc. ("WMC") is a corporation organized under the laws of the State of California that owns and operates Central Valley Waste Services, a waste disposal, material recovery facility, transfer station, and recycling center at 1333 E. Turner Road in Lodi, California (the "Facility") pursuant to State Water Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter, the "General Permit"). A map of the Facility is attached hereto as Exhibit A and incorporated by reference. CSPA and WMC shall be referred to herein collectively as the "Parties" and each individually as a "Party."

3. On or about April 29, 2008, CSPA provided WMC with a Notice of Violation and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365.

4. On September 16, 2008, CSPA filed its Complaint in the United States District Court for the Eastern District of California against WMC (*California Sportfishing Protection Alliance v. Waste Management of California, Inc.*, Case No. 2:08-cv-02179-FCD-KJM). A true and correct copy of the Complaint, including the 60-Day Notice Letter, is attached hereto as Exhibit B and incorporated by reference.

1       5.     WMC denies any and all of CSPA's claims in its 60-Day Notice Letter and

2   Complaint.

3

4       6.     CSPA and WMC, through their authorized representatives and without either

5   adjudication of CSPA's claims or admission by WMC of any alleged violation or other wrongdoing,

6   have chosen to resolve in full CSPA's allegations in the 60-Day Notice Letter and Complaint

7   through settlement and avoid the cost and uncertainties of further litigation.

8

9       7.     The Parties wish to compromise, resolve, settle, and terminate any and all disputes or

10  claims between them as to the allegations set forth in the 60-Day Notice Letter and Complaint and as

11  a result consent to the entry of this Consent Decree and Order without trial of any issues and

12  stipulate that in order to settle the Claims, this Consent Decree and order should be entered. This

13  Consent Decree constitutes a settlement of disputed claims. It is not an admission of jurisdiction

14  over or liability for the allegations set forth in the 60-Day Notice Letter and Complaint or an

15  admission of any fact. Should this proposed Consent Decree fail to be entered for any reason, this

16  proposed Consent Decree, and any statement or other provision contained in this proposed Consent

17  Decree shall have no legal effect and shall not be used for any purpose in any subsequent proceeding

18  in this or any other litigation.

19

20      8.     The Parties agree, and this Court by entering this Consent Decree finds, that this

21  Consent Decree has been negotiated by the Parties in good faith, that settlement of this matter will

22  avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair,

23  reasonable, and in the public interest.

24

25      THEREFORE, with the consent of the Parties to this Consent Decree, it is ORDERED,

26  ADJUDGED AND DECREED:

27

28

**B.      COURT'S AUTHORITY**

This Court has authority under the Clean Water Act, 33 U.S.C. § 1365 to enter and enforce this Consent Decree.

**C.      INJUNCTIVE RELIEF**

1.      **Effective Date.**

This Consent Decree shall be effective upon the date this Consent Decree is entered by the Court (the "Effective Date"). Pursuant to 33 U.S.C. § 1365(c)(3), the Court shall not enter this Consent Decree until 45 days after receipt of a copy of the proposed Consent Decree by the Attorney General and the Administrator of the U.S. Environmental Protection Agency.

2.      **Compliance with General Permit.**

WMC agrees to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.

3.      **Implemented Storm Water Controls**

WMC shall maintain in good working order all storm water collection and treatment systems currently installed or to be installed pursuant to this Consent Decree, including but not limited to, existing housekeeping measures.

4.      **Additional Best Management Practices**

WMC shall implement the following best management practices ("BMPs") to

– 4 –

1  improve the storm water pollution prevention measures at the drop inlets, outfalls and other

2  industrial areas located within those areas of the Facility where stormwater flows to stormwater

3  discharge points, and not to the sanitary sewer system:

4

5          a.      Within TEN (10) calendar days after the Effective Date, WMC shall improve

6  the effectiveness of the straw wattles surrounding the drop inlets in the southeastern corner of the

7  Facility by digging trenches for the wattles and anchoring the wattles into the ground. All straw

8  wattles shall be replaced and maintained as needed to maintain their effectiveness.

9

10          b.      Within TEN (10) calendar days after the Effective Date, WMC shall install

11  catch basin filters or bag inserts on all drop inlets and catch basins at the Facility. WMC shall use

12  appropriate mesh sizing to catch finer grain materials. Each filter shall be replaced or maintained as

13  needed to maintain its effectiveness.

14

15          c.      Within THIRTY (30) calendar days after the Effective Date, WMC shall

16  design removable metal or rubber covers for all drop inlets at the Facility to prevent the

17  accumulation of dirt, leaves and other sediment. The covers shall be placed over all drop inlets on or

18  before July 1st at the end of each rainy season, subsequent to appropriate maintenance of the filters

19  described above. The covers shall be removed prior to the first rain event of the subsequent rainy

20  season. The covers shall be fitted to prevent such materials from entering the drop inlets and

21  designed such that the covers will remain firmly in place while there is normal activity at the

22  Facility.

23

24          d.      By October 1, 2009, WMC shall re-direct the storm water flow currently

25  exiting the Facility at Discharge Point #3 to the treatment system at Discharge Point #4.[1]

26

27  ─────────────────

28  [1] Discharge Point #3 has already been re-directed to Discharge Point #4, resulting in two stormwater discharge points: #1 and #4. WMC now designates the former Discharge Point #4 as Sampling Point #2. However, for purposes of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  e.  Within TEN (10) calendar days after the Effective Date, WMC shall augment

2 the berm dividing the transfer station area that discharges to the sanitary sewer from the adjacent

3 areas that discharge to the storm drain system to ensure that the berm effectively divides the two

4 drainage areas and prevents storm water from flowing between the areas.

5

6  f.  During each rainy season covered by this AGREEMENT, WMC shall place

7 covers over all discarded materials stored in outside containers, including but not limited to

8 discarded appliances, equipment, and other miscellaneous parts. During the rainy season, WMC

9 may store discarded materials, equipment, and parts, outside on an occasional and temporary basis,

10 but must cover any outside storage in advance of and during any rain events. During the dry season,

11 WMC may store materials outside uncovered. Appliances and other large materials will be stored in

12 areas that drain to the sanitary sewer.

13

14  **5.  Increased Housekeeping Measures**

15

16  Within TEN (10) calendar days after the Effective Date, WMC shall institute the

17 following accelerated cleaning schedule in those areas of the Facility where stormwater flows to

18 stormwater discharge points, and not to the sanitary sewer system:

19

20  a.  WMC will make the following improvements to its sweeping program:

21

22  (i)  On each day that it is opened and staffed, WMC shall conduct daily,

23  manual or mechanical sweeping of high traffic areas at the Facility, including

24  the areas adjacent to the transfer station, to reduce tracking of sediment and

25  other loose materials. Persons performing manual sweeping will be trained to

26  inspect for and clean up visible oil spills.

27
consistency, this Consent Decree will continue to use the older designations of #1 and #4.

28

−6−

1      (ii) WMC shall conduct weekly, mechanical sweeping of the entire

2     Facility.

3

4      (iii) All sweeping activities performed at the Facility shall be recorded in a

5     sweeping log. A sample blank log form will be included in the Facility's

6     Annual Report and the Storm Water Pollution Prevention Plan.

7

8    b. WMC shall require its drivers to inspect their vehicles every day, pursuant to

9 Central Valley Waste Service's Driver Vehicle Inspection Report ("DVIR"). Each driver shall

10 ensure that his/her vehicle is parked in the correct designated parking space. The inspection shall

11 include an examination of each parking space for evidence of oil leaks.

12

13    c. WMC shall implement a program for inspecting and cleaning out the drop

14 inlet filters, including weekly inspections and, if necessary, cleanouts during the rainy season.

15 WMC shall monitor the filters for damage and replace as necessary.

16

17  **6.** **Monitoring**

18

19    WMC agrees to perform the monitoring described herein during the 2008-2009,

20 2009-2010, and 2010-2011 rainy seasons in addition to the minimum monitoring requirements of the

21 General Permit.

22

23    a. WMC shall monitor all storm water discharge locations. For each discharge

24 location, monitoring samples shall be collected at a point downstream from any management

25 measures and treatment systems. Monitoring shall be performed consistent with the monitoring

26 requirements of the General Permit.

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    b.    During the 2008-2009 and 2009-2010 rainy seasons, WMC shall sample and
2  analyze storm water discharges from four (4) qualifying storm events (to the extent that such
3  qualifying events occur) that result in discharge consistent with the requirements and protocols set
4  forth in the General Permit. During the 2010-2011 rainy season, WMC shall sample and analyze
5  storm water discharges from three (3) qualifying storm events that result in discharge consistent with
6  the requirements and protocols set forth in the General Permit.

7

8    c.    WMC shall analyze each storm water sample taken in accordance with the
9  General Permit and this Consent Decree for, at a minimum, total suspended solids ("TSS"), pH, oil
10 and grease or total organic carbon, electrical conductivity, chemical oxygen demand, zinc, iron,
11 copper, aluminum, and lead. WMC may eliminate one or more of these pollutants from future
12 sampling analysis as allowed by Section B.5.c. of the General Permit.

13

14    d.    WMC shall conduct monthly visual observations of each discharge location
15 for at least one qualifying rain event per month (unless no such qualifying event occurs) that results
16 in any discharge from the Facility. WMC shall maintain a written log describing these observations.

17

18    e.    During each of its monthly wet weather storm inspections required by the
19 General Permit, WMC shall photograph the drop inlets that flow to stormwater discharge points.
20 WMC is not required to remove the lids, grates, or filter inserts for purposes of photographing each
21 drop inlet. Copies of the photographs will be attached to the Facility's Annual Reports.

22

23    f.    All photographs required by this Settlement Agreement shall be in color and
24 electronically formatted. Each photograph shall be identified by date, the person taking the
25 photograph and the location of the Facility being photographed. The title of each electronic
26 photograph shall include, at a minimum, the date it was taken, the initials of the person taking the
27 photograph and the location of the photographed area (for example, "6.13.2008 MRL SP-2"). Any
28

1    photograph required by this Settlement Agreement shall be provided to CSPA upon request via

2    compact disc(s).

3

4       **7.**     **Monitoring Results**

5

6       Results from WMC's sampling and analysis during the term of this Consent Decree

7    shall be provided to CSPA within 30 calendar days of receipt of the sampling results by WMC or its

8    counsel.

9

10       **8.**     **Meet and Confer Regarding Exceedance of Levels of Potential Concern**

11

12       If analytical results of storm water samples taken by WMC during the 2008-2009,

13    2009-2010, or the 2010-2011 rainy seasons indicate that storm water discharges from the Facility

14    exceed the following levels of potential concern – Total Suspended Solids: 100 mg/L; Specific

15    Conductance: 200 μmhos/cm; Oil & Grease: 15 mg/L or Total Organic Carbon: 120 mg/L; pH: 6.0-

16    9.0 s.u.; Aluminum: 0.75 mg/L; Zinc: 0.117 mg/L; Iron: 1.0 mg/L; Copper: 0.0636 mg/L; Lead:

17    0.0816 mg/L; and Chemical Oxygen Demand: 120 mg/L. WMC agrees to take additional feasible

18    measures aimed at reducing pollutants in the Facility's storm water to levels at or below these levels.

19

20       In furtherance of that objective, WMC shall prepare a written statement

21    ("Memorandum") discussing:

22

23         a.     any exceedance or exceedances;

24

25         b.     an explanation of the possible cause(s) and/or source(s) of any exceedance;

26    and

27

28

*REED SMITH LLP*
*A limited liability partnership formed in the State of Delaware*

1    c.    additional feasible best management practices, if any, that will be taken to

2    further reduce the possibility of future exceedance(s).

3

4        Such Memorandum shall be e-mailed and sent via first class mail to CSPA not later

5    than July 15th following the conclusion of each rainy season.

6

7        Any additional measures set forth in the Memorandum shall be implemented as soon

8    as practicable, but not later than 21 calendar days from the due date of the Memorandum, except

9    where 1) structural changes require longer than 21 calendar days to complete; 2) weather-related

10   conditions render immediate implementation infeasible; or 3) the Parties agree in writing to defer

11   implementation of specific measures in order to effectively meet and confer in accordance with this

12   Section. Within thirty (30) calendar days of implementation, WMC's SWPPP shall be amended to

13   include all additional BMP measures designated in the Memorandum.

14

15   Upon receipt of the Memorandum, CSPA may review and comment on any additional

16   measures. If requested by CSPA within 21 days of receipt of such Memorandum, CSPA and WMC

17   shall meet and confer and conduct a site inspection within 60 days after the due date of the

18   Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures

19   to improve the quality of the Facility's storm water to levels at or below the Levels of Potential

20   Concern. If within 21 days of the parties meeting and conferring, the Parties do not agree on the

21   adequacy of the additional measures set forth in the Memorandum, the Parties may agree to seek a

22   settlement conference with the Judge assigned to this action pursuant to Section J.2 below. If the

23   Parties fail to reach agreement on additional measures, CSPA may bring a motion before the Judge

24   consistent with Section J.2 below. If CSPA does not request a meet and confer regarding the

25   Memorandum within the 21 day comment period provided for in this paragraph, CSPA shall waive

26   any right to object to such Memorandum pursuant to this Consent Decree.

27

28   Any concurrence or failure to object by CSPA with regard to the reasonableness of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

− 10 −

1   any additional measures implemented by WMC shall not be deemed to be an admission of the

2   adequacy of such measures should they fail to bring the Facility's storm water into compliance with

3   applicable water quality criteria.

4

5           In addition to any site inspections conducted as part of meeting and conferring on

6   additional measures set forth above, WMC shall permit representatives of CSPA to perform one (1)

7   additional site visit to the Facility per year during normal daylight business hours during the term of

8   this Consent Decree; provided that CSPA provides WMC via e-mail with at least one week prior

9   written notice.

10

11          9.      **Provision of Documents and Reports**

12

13          During the term of this Consent Decree, WMC shall provide CSPA with a copy of all

14   documents submitted to the Regional Board or the State Water Resources Control Board ("State

15   Board") concerning the Facility's storm water discharges, including but not limited to all documents

16   and reports submitted to the Regional Board and/or State Board as required by the General Permit.

17   Such documents and reports shall be mailed to CSPA contemporaneously with submission to such

18   agency. WMC also shall provide CSPA a copy of all documents referenced in this agreement,

19   including but not limited to logs, photographs, or analyses, within seven (7) calendar days of a

20   written request (via e-mail or regular mail) by CSPA.

21

22          10.     **Amendment of SWPPP and SWMP**

23

24          Within sixty (60) calendar days of the Effective Date of this Consent Decree, WMC

25   shall amend the Facility's SWPPP and the Facility's Storm Water Monitoring Plan ("SWMP") to

26   incorporate all changes, improvements, sample log forms, and best management practices set forth in

27   or resulting from this Consent Decree. The Facility shall ensure that all maps, tables, and text

28   comply with the requirements of the General Permit. A copy of the amended SWPPP and SWMP

– 11 –

1   shall be provided to CSPA within thirty (30) calendar days of completion.  Specific measures

2   include the following:

3

4          a.       WMC shall amend the SWPPP and SWMP in the following ways:

5

6                   i.      The SWPPP shall include adequate descriptions and assessments of

7                           potential pollutant sources.

8

9                   ii.     The SWPPP shall specifically describe the BMPs at the Facility, such

10                          as a narrative describing the sand or oil traps used to treat storm water

11                          discharges near discharge points 1 and 4, and a description for a

12                          program of cleaning out the clarifiers.

13

14                  iii.    Table 1 of the SWPPP shall summarize all areas of industrial

15                          activities, potential pollutant sources, potential pollutants, associated

16                          best management practices (BMP's), and describe the actual storm

17                          water discharge locations.

18

19         b.       WMC shall amend the SWPPP map by making it clearer and easier to read,

20  drawing it to scale and indicating orientation, indicating facility boundaries, indicating the direction

21  of storm water flows, indicating the portions of the drainage areas impacted by run-on from

22  surrounding areas, indicating areas of soil erosion, identifying the municipal storm drain inlets where

23  the facility's storm water discharges may be received, indicating the location of the storm water

24  collection and conveyance system (including all drop inlets and locations of storm water sampling),

25  indicating the location of the Facility's structural control measures, indicating locations where

26  materials are directly exposed to precipitation, and indicating the locations where significant spills or

27  leaks are identified.

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 12 –

**D.   MITIGATION PAYMENT**

In recognition of the good-faith efforts by WMC to comply with all aspects of the General Permit and the Clean Water Act, and in lieu of payment by WMC of any penalties, which may have been assessed in this action if it had proceeded to trial, WMC agrees to pay the sum of THIRTY-TWO THOUSAND FIVE HUNDRED DOLLARS ($32,500) to the Rose Foundation for Communities and the Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally beneficial projects within the Sacramento-San Joaquin Delta Watershed, relating to water quality improvements in the area. Payment shall be made by WMC within THIRTY (30) calendar days of the Effective Date. Payment by WMC shall be made in the form of a single check payable to the "Rose Foundation."

**E.   ATTORNEY'S FEES AND COSTS; COMPLIANCE OVERSIGHT COSTS**

As reimbursement for CSPA's investigative, expert and attorneys' fees and costs, WMC shall pay CSPA the sum of THIRTY-TWO THOUSAND FIVE HUNDRED DOLLARS ($32,500). Payment shall be made by WMC within THIRTY (30) calendar days of the Effective Date. Payment by WMC to CSPA shall be made in the form of a single check payable to "Lozeau Drury LLP Attorney-Client Trust Account," and shall constitute full payment for all costs of litigation, including investigative, expert and attorneys' fees and costs incurred by CSPA that have or could have been claimed in connection with CSPA's claims, up to and including the Effective Date of this Consent Decree.

As reimbursement for CSPA's future costs that will be incurred in order for CSPA to monitor WMC's compliance with this Consent Decree and to effectively meet and confer and evaluate monitoring results for the Facility, WMC agrees to pay CSPA the amount of NINE THOUSAND DOLLARS ($9,000) for costs incurred in overseeing the implementation of this Consent Decree. WMC shall make payment to the Lozeau-Drury LLP Attorney-Client Trust

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Account within thirty (30) days after the Effective Date.

2

3  F.    RELEASE OF CLAIMS; COVENANT NOT TO SUE

4

5  In consideration of the above, and except as otherwise provided by this Consent

6  Decree, the Parties hereby forever and fully release each other and their respective successors,

7  assigns, officers, agents, employees, and all persons, firms and corporations having an interest in

8  them, from any and all claims, demands, liabilities, damages, injuries, actions or causes of action,

9  either at law or in equity, which the Parties have against each other arising from or related to

10  CSPA's allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and

11  including the Termination Date of this Consent Decree.

12

13  The Parties acknowledge that they are familiar with section 1542 of the California

14  Civil Code, which provides:

15

16  A general release does not extend to claims which the creditor does not

17  know or suspect to exist in his or her favor at the time of executing the

18  release, which if known by him or her must have materially affected his or

19  her settlement with the debtor.

20

21  The Parties hereby waive and relinquish any rights or benefits they may have under

22  California Civil Code section 1542 with respect to any other claims against each other arising from,

23  or related to, the allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to

24  and including the Termination Date of this Consent Decree.

25

26  For the period beginning on the Effective Date and ending on December 15, 2011,

27  CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any

28  organization under the control of CSPA, its officers, executive staff, or members of its governing

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    board, will file any lawsuit against WMC seeking relief for alleged violations of the Clean Water

2    Act or violations of the General Permit. CSPA further agrees that, beginning on the Effective Date

3    and ending on December 15, 2011, CSPA will not support other lawsuits, by providing financial

4    assistance, personnel time or other affirmative actions, against WMC that may be proposed by other

5    groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to

6    challenge WMC's compliance with the Clean Water Act or the General Permit.

7

8    **G.**     **NOTICE TO THE FEDERAL GOVERNMENT**

9

10            WMC shall submit this Consent Decree to the U.S. EPA and the U.S. Department of

11    Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five (5)

12    calendar days after filing of this Consent Decree with the Court for review consistent with 33 U.S.C.

13    § 1365(c)(3). The Agencies' review period expires forty-five (45) calendar days after receipt of the

14    Consent Decree by both Agencies, as evidenced by the return receipts, copies of which shall be

15    provided to CSPA upon receipt by WMC.

16

17    **H.**     **TERMINATION DATE OF CONSENT DECREE**

18

19            This Consent Decree shall terminate on December 15, 2011.

20

21    **I.**     **BREACH OF CONSENT DECREE; IMPOSSIBILITY OF PERFORMANCE**

22

23            Where implementation of the actions set forth in this Consent Decree, within the

24    deadlines set forth in those paragraphs, becomes impossible, despite the timely good faith efforts of

25    the Parties, the Party who is unable to comply shall notify the other in writing within seven (7)

26    calendar days of the date that the failure becomes apparent, and shall describe the reason for the non-

27    performance. The Parties agree to meet and confer in good faith concerning the non-performance

28    and, where the Parties concur that the non-performance was or is impossible, despite the timely good

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  faith efforts of one of the Parties, new performance deadlines shall be established. In the event that

2  the Parties cannot timely agree upon the terms of such a stipulation, either of the Parties shall have

3  the right to invoke the dispute resolution procedure described herein.

4

5  **J.    GENERAL PROVISIONS**

6

7          1.     No Admission or Finding.  Neither this Consent Decree nor any payment

8  pursuant to the Consent Decree shall constitute evidence or be construed as a finding, adjudication,

9  or acknowledgment of any fact, law or liability, nor shall it be construed as an admission of violation

10 of any law, rule or regulation.  However, this Consent Decree and/or any payment pursuant to the

11 Consent Decree may constitute evidence in actions seeking compliance with this Consent Decree.

12

13         2.     Dispute Resolution Procedures.  Except as specifically noted herein, any

14 dispute with respect to any of the provisions of this Consent Decree shall be resolved through the

15 following procedure.  The Parties agree to first meet and confer to resolve any dispute arising under

16 this Consent Decree.  In the event that such disputes cannot be resolved through this meet and confer

17 process, the Parties agree to request a settlement meeting before the Judge assigned to this action.  In

18 the event that the Parties cannot resolve the dispute by the conclusion of the settlement meeting with

19 the Judge, the Parties agree that either Party may submit the dispute via motion to the Judge.

20

21         In resolving any dispute arising from this Consent Decree, the Judge shall have discretion

22 to award attorneys' fees and costs to either Party.  The relevant provisions of the then-applicable

23 Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of

24 fees and costs in connection with the resolution of any disputes before the Judge.  The Judge shall

25 award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof.

26 The Parties agree to file any waivers necessary for the Judge to preside over any settlement

27 conference and motion practice.

28

1    3.    Construction. The language in all parts of this Consent Decree shall be

2 construed according to its plain and ordinary meaning, except as to those terms defined by law, in

3 the General Permit, Clean Water Act or specifically herein.

4

5    4.    Choice of Law. This Consent Decree shall be governed by the laws of the

6 United States, and where applicable, the laws of the State of California.

7

8    5.    Severability. In the event that any provision, section, or sentence of this

9 Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions

10 shall not be adversely affected.

11

12    6.    Correspondence. All notices required herein or any other correspondence

13 pertaining to this Consent Decree shall be sent by regular, certified, or overnight mail as follows:

14

15    If to CSPA:

16

17    Bill Jennings, Chairman
    California Sportfishing Protection Alliance
18    3536 Rainier Road
    Stockton, CA 95204
19    Tel: (209) 464-5067
    deltakeep@aol.com
20
    And to:
21

22    Michael R. Lozeau
    Lozeau Drury LLP
23    1516 Oak Street, Suite 216
    Alameda, CA 94501
24    Tel: (510) 749-9102
25    michael@lozeaudrury.com

26

27

28    If to WMC:

– 17 –

1  Waste Management of California, Inc.
   Attention: District Manager
2  1333 E. Turner Rd
   Lodi, CA  95240
3

4  And to:

5

6  John Lynn Smith
   Reed Smith LLP
7  1999 Harrison Street
   Suite 2200
8  Oakland, CA 94612
   Tel: (510) 466-6778
9  jlsmith@reedsmith.com

10     Notifications of communications shall be deemed submitted on the date that they are

11  e-mailed, postmarked and sent by first-class mail or deposited with an overnight mail/delivery

12  service. Any change of address or addresses shall be communicated in the manner described above

13  for giving notices.

14

15     7.     Counterparts. This Consent Decree may be executed in any number of

16  counterparts, all of which together shall constitute one original document. Telecopied, scanned

17  (.pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed

18  counterparts of this Consent Decree.

19

20     8.     Assignment. Subject only to the express restrictions contained in this Consent

21  Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the

22  benefit of and be binding upon the Parties, and their successors and assigns.

23

24     9.     Modification of the Agreement. This Consent Decree, and any provisions

25  herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed

26  by the Parties.

27

28     10.     Full Settlement. This Consent Decree constitutes a full and final settlement of

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   this matter. It is expressly understood and agreed that the Consent Decree has been freely and

2   voluntarily entered into by the Parties with and upon advice of counsel.

3

4         11.    Integration Clause. This is an integrated Consent Decree. This Consent

5   Decree is intended to be a full and complete statement of the terms of the agreement between the

6   Parties and expressly supersedes any and all prior oral or written agreements covenants,

7   representations and warranties (express or implied) concerning the subject matter of this Consent

8   Decree.

9

10         12.    Authority. The undersigned representatives for CSPA and WMC each certify

11   that he/she is fully authorized by the Party whom he/she represents to enter into the terms and

12   conditions of this Consent Decree.

13

14   **K.   RETENTION OF JURISDICTION**

15

16         Subject to the provisions of this Consent Decree, this Court shall retain jurisdiction to

17   enforce the terms and conditions of this Consent Decree. This Consent Decree shall terminate after

18   all terms and conditions specified within this Consent Decree have been satisfied.

19

20        SO AGREED AND STIPULATED:

21   Dated: _1/May 2009_

22                             CALIFORNIA SPORTFISHING PROTECTION

23                             ALLIANCE

24                             By _Bill Jannings_   Executive Director
                                                 (Title)

25   Dated: _7 May 2009_

26                             WASTE MANAGEMENT OF CALIFORNIA
                             INC.

27                             By: _____

28                                     (Title)
                                 ASSISTANT SECRETARY

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

2   **APPROVED AS TO FORM:**

3   **LOZEAU DRURY LLP**

4   _____
    Michael R. Lozeau
5   Attorneys for Plaintiff

6   REED SMITH LLP

7   _____
    John Lynn Smith
8   Attorneys for Defendant

9        **IT IS SO ORDERED.**

10       Dated and entered into on 7/20/09.

11

12

13       FRANK C. DAMRELL, JR.
         UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**APPROVED AS TO FORM:**

LOZEAU DRURY LLP

_____
Michael R. Lozeau
Attorneys for Plaintiff

REED SMITH LLP

_____
John Lynn Smith
Attorneys for Defendant

    **IT IS SO ORDERED.**

    Dated and entered into on _____.


_____
UNITED STATES DISTRICT JUDGE

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# EXHIBIT A



Exhibit A
Note: This facility map is provided for general reference purposes only and may not reflect current site conditions relating to stormwater flows, drainages, or discharge points.

# EXHIBIT B (1 OF 3)

Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: michael@lozeaudrury.com
           doug@lozeaudrury.com

Andrew L. Packard (State Bar No. 168690)
Michael P. Lynes (State Bar No. 230462)
LAW OFFICES OF ANDREW L. PACKARD
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>            Plaintiff,<br><br>    vs.<br><br>WASTE MANAGEMENT OF CALIFORNIA, INC., a corporation.<br><br>            Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or

"the Act"). This Court has subject matter jurisdiction over the parties and the subject matter

COMPLAINT

1    of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28

2    U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is

3    authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

4    actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§

5    1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

6        2.     On or about April 29, 2008, Plaintiff provided notice of Defendant's violations

7    of the Act, and of its intention to file suit against Defendant, to the Administrator of the

8    United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region

9    IX; the Executive Director of the State Water Resources Control Board ("State Board"); the

10    Executive Officer of the Regional Water Quality Control Board, Central Valley Region

11    ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A

12    true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by

13    reference.

14        3.     More than sixty days have passed since notice was served on Defendant and

15    the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that

16    neither the EPA nor the State of California has commenced or is diligently prosecuting a

17    court action to redress the violations alleged in this complaint. This action's claim for civil

18    penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

19    33 U.S.C. § 1319(g).

20        4.     Venue is proper in the Eastern District of California pursuant to Section .

21    505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

22    within this judicial district. Pursuant to Local Rule 3-120, intradistrict venue is proper in

23    Sacramento, California because the source of the violations is located within San Joaquin

24    County.

25    **II.**    **INTRODUCTION**

26        5.     This complaint seeks relief for Defendant's discharges of polluted storm water

27    and non-storm water pollutants from Defendant's Facility ("the Facility") in violation of the

28    Act and the State of California's "Waste Discharge Requirements (WDRs) For Discharges

COMPLAINT

2

1   of Storm Water Associated With Industrial Activities Excluding Construction Activities,"

2   State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-

3   DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No.

4   97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") Permit No.

5   CAS000001, (hereinafter "the Order" or "Permit"). Defendant's violations of the discharge,

6   treatment technology, monitoring requirements, and other procedural and substantive

7   requirements of the Permit and the Act are ongoing and continuous.

8       6.      The failure on the part of persons and facilities such as Defendant and its

9   industrial facility to comply with storm water requirements is recognized as a significant

10  cause of the continuing decline in water quality of the Mokelumne River, the San Joaquin

11  River, the Sacramento-San Joaquin River Delta ("the Delta"), and other area receiving

12  waters. The general consensus among regulatory agencies and water quality specialists is

13  that storm pollution amounts to a substantial portion of the total pollution entering the

14  aquatic environment each year. In most areas of San Joaquin County, storm water flows

15  completely untreated through storm drain systems or other channels directly to the waters of

16  the United States.

17  **III.   PARTIES**

18      7.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

19  ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

20  California with its main office in Stockton, California. CSPA has approximately 2,000

21  members who live, recreate and work in and around waters of the State of California,

22  including the Mokelumne River, the Sacramento River, the San Joaquin River, the Delta,

23  Suisun Bay and the San Francisco Bay. CSPA is dedicated to the preservation, protection,

24  and defense of the environment, the wildlife and the natural resources of all waters of

25  California. To further these goals, CSPA actively seeks federal and state agency

26  implementation of the Act and other laws and, where necessary, directly initiates

27  enforcement actions on behalf of itself and its members.

28      8.      Members of CSPA reside in and around the Sacramento-San Joaquin Delta and

COMPLAINT

3

1    enjoy using the San Joaquin River, the Mokelumne River, and the Delta for recreation and

2    other activities. Members of CSPA use and enjoy the waters into which Defendant has

3    caused, is causing, and will continue to cause, pollutants to be discharged. Members of

4    CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife and engage

5    in scientific study including monitoring activities, among other things. Defendant's

6    discharges of pollutants threaten or impair each of those uses or contribute to such threats

7    and impairments. Thus, the interests of CSPA's members have been, are being, and will

8    continue to be adversely affected by Defendant's failure to comply with the Clean Water Act

9    and the Permit. The relief sought herein will redress the harms to Plaintiff caused by

10    Defendant's activities.

11        9.     Continuing commission of the acts and omissions alleged above will irreparably

12    harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy

13    at law.

14        10.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

15    WASTE MANAGEMENT OF CALIFORNIA, INC. (hereinafter "Defendant" or "Waste

16    Management") is a corporation organized under the laws of California. Defendant Waste

17    Management operates Central Valley Waste Services, Inc., a material recovery facility,

18    waste disposal, transfer station, and recycling center in Lodi, California.

19    **IV.    STATUTORY BACKGROUND**

20        11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

21    pollutant into waters of the United States, unless such discharge is in compliance with

22    various enumerated sections of the Act. Among other things, Section 301(a) prohibits

23    discharges not authorized by, or in violation of, the terms of an NPDES permit issued

24    pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

25        12.     Section 402(p) of the Act establishes a framework for regulating municipal and

26    industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States

27    with approved NPDES permit programs are authorized by Section 402(p) to regulate

28    industrial storm water discharges through individual permits issued to dischargers or through

COMPLAINT

4

1   the issuance of a single, statewide general permit applicable to all industrial storm water

2   dischargers. 33 U.S.C. § 1342(p).

3        13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

4   U.S. EPA has authorized California's State Board to issue NPDES permits including general

5   NPDES permits in California.

6        14.    The State Board elected to issue a statewide general permit for industrial storm

7   water discharges. The State Board issued the General Permit on or about November 19,

8   1991, modified the General Permit on or about September 17, 1992, and reissued the

9   General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water

10   Act, 33 U.S.C. § 1342(p).

11       15.    In order to discharge storm water lawfully in California, industrial dischargers

12   must comply with the terms of the General Permit or have obtained and complied with an

13   individual NPDES permit. 33 U.S.C. § 1311(a).

14       16.    The General Permit contains several prohibitions. Effluent Limitation B(3) of

15   the General Permit requires dischargers to reduce or prevent pollutants in their storm water

16   discharges through implementation of the Best Available Technology Economically

17   Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional

18   Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include

19   both nonstructural and structural measures. General Permit, Section A(8). Discharge

20   Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-

21   storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

22   Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to

23   any surface or ground water that adversely impact human health or the environment.

24   Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that

25   cause or contribute to an exceedance of any applicable water quality standards contained in

26   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27       17.    In addition to absolute prohibitions, the General Permit contains a variety of

28   substantive and procedural requirements that dischargers must meet. Facilities discharging,

COMPLAINT

1    or having the potential to discharge, storm water associated with industrial activity that have
2    not obtained an individual NPDES permit must apply for coverage under the State's General
3    Permit by filing a Notice of Intent To Comply ("NOI"). The General Permit requires
4    existing dischargers to have filed their NOIs before March 30, 1992.

5        18.    EPA has established Parameter Benchmark Values as guidelines for
6    determining whether a facility discharging industrial storm water has implemented the
7    requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). EPA has established
8    Parameter Benchmark Values for the following parameters, among others: total suspended
9    solids – 100 mg/L; oil/grease – 15 mg/L; total organic carbon – 110 mg/L; pH – 6.0 – 9.0
10   s.u.; aluminum – 0.75 mg/L; iron – 1.0 mg/L; and chemical oxygen demand – 120 mg/L.
11   The California State Water Resources Control Board has proposed a Benchmark Value for
12   electrical conductance of 200 μmhos/cm.

13       19.    Dischargers must develop and implement a Storm Water Pollution Prevention
14   Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures
15   that comply with the BAT and BCT standards. The General Permit requires that an initial
16   SWPPP have been developed and implemented before October 1, 1992. The SWPPP must,
17   among other requirements, identify and evaluate sources of pollutants associated with
18   industrial activities that may affect the quality of storm and non-storm water discharges from
19   the facility and identify and implement site-specific best management practices ("BMPs") to
20   reduce or prevent pollutants associated with industrial activities in storm water and
21   authorized non-storm water discharges (Section A(2)). The SWPPP's BMPs must
22   implement BAT and BCT (Section B(3)). The SWPPP must include: a description of
23   individuals and their responsibilities for developing and implementing the SWPPP (Section
24   A(3)); a site map showing the facility boundaries, storm water drainage areas with flow
25   pattern and nearby water bodies, the location of the storm water collection, conveyance and
26   discharge system, structural control measures, impervious areas, areas of actual and potential
27   pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials
28   handled and stored at the site (Section A(5)); a description of potential pollutant sources

COMPLAINT

6

1   including industrial processes, material handling and storage areas, dust and particulate
2   generating activities, and a description of significant spills and leaks, a list of all non-storm
3   water discharges and their sources, and a description of locations where soil erosion may
4   occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources
5   at the Facility and a description of the BMPs to be implemented at the Facility that will
6   reduce or prevent pollutants in storm water discharges and authorized non-storm water
7   discharges, including structural BMPs where non-structural BMPs are not effective (Section
8   A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where
9   necessary (Section A(9),(10)).

10      20.    Section C(11)(d) of the General Permit's Standard Provisions requires
11  dischargers to report any noncompliance to the Regional Board. *See also* Section E(6).
12  Section A(9) of the General Permit requires an annual evaluation of storm water controls
13  including the preparation of an evaluation report and implementation of any additional
14  measures in the SWPPP to respond to the monitoring results and other inspection activities.

15      21.    The General Permit requires dischargers commencing industrial activities
16  before October 1, 1992 to develop and implement an adequate written monitoring and
17  reporting program no later than October 1, 1992. Existing facilities covered under the
18  General Permit must implement all necessary revisions to their monitoring programs no later
19  than August 1, 1997.

20      22.    As part of their monitoring program, dischargers must identify all storm water
21  discharge locations that produce a significant storm water discharge, evaluate the
22  effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control
23  measures set out in the SWPPP are adequate and properly implemented. Dischargers must
24  conduct visual observations of these discharge locations for at least one storm per month
25  during the wet season (October through May) and record their findings in their Annual
26  Report. Dischargers must also collect and analyze storm water samples from at least two
27  storms per year. Section B(5)(a) of the General Permit requires that dischargers "shall
28  collect storm water samples during the first hour of discharge from (1) the first storm event

COMPLAINT

7

1  of the wet season, and (2) at least one other storm event in the wet season. All storm water

2  discharge locations shall be sampled." Section B(5)(c)(i) requires dischargers to sample and

3  analyze during the wet season for basic parameters, such as pH, total suspended solids

4  ("TSS"), electrical conductance, and total organic content ("TOC") or oil and grease

5  ("O&G"), certain industry-specific parameters, and Section B(5)(c)(ii) toxic chemicals and

6  other pollutants likely to be in the storm water discharged from the facility. Dischargers

7  must also conduct dry season visual observations to identify sources of non-storm water

8  pollution. Section B(7)(a) indicates that the visual observations and samples must represent

9  the "quality and quantity of the facility's storm water discharges from the storm event."

10  Section B(7)(c) requires that "if visual observation and sample collection locations are

11  difficult to observe or sample…facility operators shall identify and collect samples from

12  other locations that represent the quality and quantity of the facility's storm water discharges

13  from the storm event."

14       23.  Section B(14) of the General Permit requires dischargers to submit an annual

15  report by July 1 of each year to the executive officer of the relevant Regional Board. The

16  annual report must be signed and certified by an appropriate corporate officer. Sections

17  B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include

18  in their annual report an evaluation of their storm water controls, including certifying

19  compliance with the General Permit. *See also* Sections C(9), C(10) and B(14).

20       24.  Section 505(a)(1) and Section 505(f) of the Act provide for citizen

21  enforcement actions against any "person," including individuals, corporations, or

22  partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f),

23  § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. §

24  1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to

25  $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500

26  per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33

27  U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 – 19.4.

28       25.  The Regional Board has established water quality standards for the

COMPLAINT

8

1    Mokelumne River, the San Joaquin River and the Sacramento-San Joaquin Delta in the

2    Water Quality Control Plan for the Sacramento and San Joaquin River Basins, generally

3    referred to as the Basin Plan.

4         26.    The Basin Plan includes a standard for electrical conductivity in the Delta of

5    0.7 mmhos/cm from April 1 through August 31 and 1.0 mmhos/cm from September 1

6    through March 31.

7         27.    The Basin Plan provides that "[w]aters shall not contain chemical constituents

8    in concentrations that adversely affect beneficial uses."

9         28.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll

10   waters shall be maintained free of toxic substances in concentrations that produce

11   detrimental physiological responses in human, plant, animal, or aquatic life."

12        29.    The Basin Plan provides that "[w]aters shall be free of changes in turbidity that

13   cause nuisance or adversely affect beneficial uses."

14        30.    The Basin Plan provides that "[w]aters shall not contain suspended material in

15   concentrations that cause nuisance or adversely affect beneficial uses."

16        31.    The Basin Plan provides that "[t]he suspended sediment load and suspended

17   sediment discharge rate of surface waters shall not be altered in such a manner as to cause

18   nuisance or adversely affect beneficial uses."

19        32.    The Basin Plan provides that "[w]aters shall be free of discoloration that

20   causes nuisance or adversely affect beneficial uses."

21        33.    The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes,

22   or other materials in concentrations that cause nuisance, result in a visible film or coating on

23   the surface of the water or on objects in the water, or otherwise adversely affect beneficial

24   uses."

25        34.    The Basin Plan includes a numeric water quality standard for iron of 0.3

26   milligrams per liter ("mg/L").

27        35.    The Basin Plan includes a dissolved oxygen concentration standard of 7.0

28   mg/L.

COMPLAINT
                                          9

**V.    STATEMENT OF FACTS**

36.    Defendant Waste Management operates Central Valley Waste Services, Inc., a waste disposal, material recovery facility, transfer station, and recycling center at 1333 E. Turner Road in Lodi, California.  The Facility is engaged in the transfer of solid waste for disposal as well as recycling operations.  The Facility falls within the Standard Industrial Classification ("SIC") Code 4953.  The Facility covers about eighteen acres, the majority of which is paved and used for transporting and storing waste materials throughout the Facility.  On information and belief, Plaintiff alleges that there are at least five buildings located on the property.  On information and belief, Plaintiff alleges that materials transfer is conducted both inside and outside of these buildings.

37.    Defendant channels and collects storm water falling on the Facility through a series of storm water drains that lead to three storm water outfalls.  Each storm water outfall collects storm water runoff from a particular area of the Facility.  These outfalls discharge to the City of Lodi's storm drain system.

38.    On information and belief, Plaintiff alleges that the industrial activities at the site include the transfer of solid waste from collection vehicles to transport vehicles which move the waste to a remote landfill for disposal, as well as recycling operations for materials such as paper, plastic, glass, wood/yard waste, scrap metal, construction debris, etc.  It also includes the storage and maintenance of trucks, tractors, and other machinery used to transfer and dispose of these materials.

39.    Significant activities at the site take place outside and are exposed to rainfall.  These activities include transfer, storage, and disposal of the numerous types of materials handled by the Facility; the storage and use of vehicles and equipment for materials handling; and the storage, handling, and disposal of waste materials.  Loading and delivery of materials occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  Trucks, tractors, and other machinery are the primary means of moving materials around the Facility.  The Facility's exposed areas contain large piles of a variety of materials.  Plaintiff alleges on information and belief that many of the exposed surfaces at

COMPLAINT
                                                        10

1  the Facility are unpaved and sediment and other materials are disturbed as a result of the

2  storage and disposal processes.  These areas are exposed to storm water and storm flows due

3  to the lack of overhead coverage, berms, and other storm water controls.

4      40.    Industrial machinery, heavy equipment and vehicles, including trucks and

5  tractors are operated and stored at the Facility in areas exposed to storm water flows.

6  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment

7  leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are

8  exposed to storm water flows, and that such machinery and equipment track sediment and

9  other contaminants throughout the Facility.

10      41.    Plaintiff is informed and believes, and thereupon alleges that the storm water

11  flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,

12  and other pollutants as it flows toward the storm water drains.  Storm water and any

13  pollutants contained in that storm water entering the drains flow directly to the City of

14  Lodi's storm drain system, which in turn flows to the Mokelumne River, which in turn flows

15  to the San Joaquin River and ultimately flows into the Delta.

16      42.    The management practices at the Facility are wholly inadequate to prevent the

17  sources of contamination described above from causing the discharge of pollutants to waters

18  of the United States.  The Facility lacks sufficient structural controls such as grading,

19  berming, roofing, containment, or drainage structures to prevent rainfall and storm water

20  flows from coming into contact with these and other exposed sources of contaminants.  The

21  Facility lacks sufficient structural controls to prevent the discharge of water once

22  contaminated.  The Facility lacks adequate storm water pollution treatment technologies to

23  treat storm water once contaminated.

24      43.    Since at least November 15, 2003, Defendant has taken samples or arranged

25  for samples to be taken of storm water discharges at the Facility.  The sample results were

26  reported in the Facility's annual reports submitted to the Regional Board.  Defendant Waste

27  Management certified each of those annual reports pursuant to Sections A and C of the

28  General Permit.

COMPLAINT

11

# EXHIBIT B (2 OF 3)

1    44.   Since at least November 15, 2003, the Facility has detected total suspended
2    solids, oil & grease, iron, and electrical conductance in storm water discharged from the
3    Facility. Since at least March 25, 2004, the Facility has detected chemical oxygen demand
4    in storm water discharged by the Facility. Since at least October 19, 2004, the Facility has
5    detected aluminum in storm water discharged by the Facility. Levels of these pollutants
6    detected in the Facility's storm water have been in excess of EPA's numeric parameter
7    benchmark values. Levels of these pollutants detected in the Facility's storm water have
8    been in excess of water quality standards established in the Basin Plan.

9    45.   The levels of iron in storm water detected by the Facility have exceeded the
10   benchmark value for iron of 1.0 mg/L established by EPA and the value of 0.3 mg/L
11   established by the Basin Plan. For example, on December 21, 2006, the level of iron
12   measured by Defendant in the Facility's discharged storm water was 38.2 mg/L. That level
13   of iron is over one hundred and twenty-seven times the standard for iron in the Basin Plan
14   and over thirty-eight times the benchmark value for iron established by EPA.

15   46.   The levels of total suspended solids in storm water detected by the Facility
16   have exceeded the benchmark value for total suspended solids of 100 mg/L established by
17   EPA. For example, on December 21, 2006, the level of suspended solids measured by
18   Defendant in the Facility's discharged storm water was 950 mg/L. That level of total
19   suspended solids is nine and a half times the benchmark value for total suspended solids
20   established by EPA.

21   47.   The level of aluminum in storm water detected by the Facility has exceeded
22   the benchmark value for aluminum of 0.75 mg/L established by EPA. For example, on
23   January 30, 2006, the level of aluminum measured by Defendant in the Facility's discharged
24   storm water was 18.4 mg/L. That level of aluminum is almost twenty-five times the
25   benchmark value for aluminum established by EPA.

26   48.   The levels of chemical oxygen demand in storm water detected by the Facility
27   have exceeded the benchmark value for chemical oxygen demand of 120 mg/L established
28   by EPA. For example, on March 25, 2004, the level of chemical oxygen demand measured

COMPLAINT
12

1   by Defendant in the Facility's discharged storm water was 1,670 mg/L. That level of

2   chemical oxygen demand is over almost fourteen times the benchmark value for chemical

3   oxygen demand established by EPA.

4       49.    The levels of oil & grease in storm water detected by the Facility have

5   exceeded the benchmark value for oil & grease of 15 mg/L established by EPA. For

6   example, on December 21, 2006, the level of oil & grease measured by Defendant in the

7   Facility's discharged storm water was 26 mg/L. That level of oil & grease is almost twice

8   the benchmark value for oil & grease established by EPA.

9       50.    The electrical conductance levels detected by the Facility in its storm water

10  have been greater than the numeric water quality standards applicable to electrical

11  conductance in California. The electrical conductance levels detected by the Facility in its

12  storm water have been greater than the benchmark value of 200 μmho/cm proposed by the

13  State Board. For example, on December 21, 2006, the electrical conductance level measured

14  by Defendant in the Facility's discharged storm water was 809 μmho/cm. That electrical

15  conductance level is over four times the State Board's proposed benchmark value.

16      51.    On information and belief, Plaintiff alleges that Defendant has failed to comply

17  with Sections B(5) and B(7) of the General Industrial Storm Water Permit by failing to

18  sample and analyze two storm water samples each year that represent the quality and

19  quantity of the facility's storm water discharges during each of the past five years, since at

20  least April 29, 2003.

21      52.    On information and belief, Plaintiff alleges that Defendant has failed to comply

22  with Section B(5)(c)(ii) by failing analyze its storm water samples for aluminum and

23  chemical oxygen demand during the 2006-2007 rainy season.

24      53.    On information and belief, Plaintiff alleges that Defendant has failed to comply

25  with Sections B(3) and B(4) of the General Permit in numerous instances since April 29,

26  2003 by failing to sample or monitor storm water and non-storm water discharge locations

27  based on general claims that no qualifying events occurred at the Facility. In addition,

28  Defendant failed to conduct monthly visual observations of the storm water discharge in

COMPLAINT
                                    13

1    January 2006 and December 2006. Defendant also failed to conduct observations for
2    unauthorized non-storm water discharges during the July – September and October –
3    December quarters during 2003.

4        54.    On information and belief, Plaintiff alleges that since at least April 29, 2003,
5    Defendant has failed to implement BAT and BCT at the Facility for its discharges of
6    suspended solids, oil and grease, iron, chemical oxygen demand, aluminum, electrical
7    conductance, and other pollutants. Section B(3) of the General Permit requires that
8    Defendant implement BAT for toxic and nonconventional pollutants and BCT for
9    conventional pollutants by no later than October 1, 1992. As of the date of this Complaint,
10   Defendant has failed to implement BAT and BCT.

11       55.    On information and belief, Plaintiff alleges that since at least October 1, 1992,
12   Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for
13   the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP
14   prepared for the Facility does not set forth site-specific best management practices for the
15   Facility that are consistent with BAT or BCT for the Facility. Plaintiff is informed and
16   believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an
17   adequate assessment of potential pollutant sources, structural pollutant control measures
18   employed by the Defendant, a list of actual and potential areas of pollutant contact, or an
19   adequate description of best management practices to be implemented at the Facility to
20   reduce pollutant discharges. According to information available to CSPA, Defendant's
21   SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to
22   further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges,
23   that the SWPPP does not include each of the mandatory elements required by Section A of
24   the General Permit.

25       56.    Information available to CSPA indicates that as a result of these practices,
26   storm water containing excessive pollutants is being discharged during rain events from the
27   Facility directly to the City of Lodi's storm drain system which flows into the Mokelumne
28   River, and then into the San Joaquin River and the Delta.

COMPLAINT
                                                14

57. The Sacramento-San Joaquin Delta has been identified by the Regional Board, State Board and federal EPA as impaired for several pollutants, including electrical conductivity, mercury, and unknown toxicity.

58. Plaintiff is informed and believes, and thereupon alleges, that pollutants discharged by the Facility in its storm water are contributing to violations of water quality standards that currently exist in the Mokelumne River, the San Joaquin River, and the Delta. Plaintiff is informed and believes, and thereupon alleges, that Defendant is discharging suspended solids, oil and grease, iron, chemical oxygen demand, aluminum, electrical conductance, and other un-monitored pollutants that are causing or contributing to exceedances of applicable water quality standards. Defendant is causing or contributing to violations of water quality standards including, but not limited to, the narrative water quality standard for chemical constituents, dissolved oxygen, oil and grease, sediment, suspended material, toxicity, turbidity, color, and the numeric water quality standards for iron and electrical conductance.

59. Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

60. Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least April 29, 2003. Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit. Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

61. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and

COMPLAINT

15

1 thereupon alleges, that all of the violations alleged in this Complaint are ongoing and

2 continuing.

3 **VI.    CLAIMS FOR RELIEF**

4                               **FIRST CAUSE OF ACTION**
                              **Failure to Implement the Best Available and**
5                              **Best Conventional Treatment Technologies**
                    **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
6
    62.    Plaintiff realleges and incorporate Paragraphs 1-61, as if fully set forth herein.
7
    63.    The General Permit's SWPPP requirements and Effluent Limitation B(3)
8
9 require dischargers to reduce or prevent pollutants in their storm water discharges through

10 implementation of BAT for toxic and nonconventional pollutants and BCT for conventional

11 pollutants. Defendant has failed to implement BAT and BCT at the Facility for its

12 discharges of suspended solids, oil and grease, iron, chemical oxygen demand, aluminum,

13 electrical conductance, and other un-monitored pollutants in violation of Effluent Limitation

14 B(3) of the General Permit.

15    64.    Each day since October 1, 1992 that Defendant has failed to develop and

16 implement BAT and BCT in violation of the General Permit is a separate and distinct violation

17 of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

18    65.    Defendant has been in violation of the BAT/BCT requirements every day since

19 October 1, 1992. Defendant continues to be in violation of the BAT/BCT requirements each

20 day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

21                              **SECOND CAUSE OF ACTION**
                    **Failure to Prepare, Implement, Review, and Update**
22                   **an Adequate Storm Water Pollution Prevention Plan**
                    **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

23    66.    Plaintiff realleges and incorporate Paragraphs 1-65, as if fully set forth herein.

24    67.    Section A and Provision E of the General Permit requires dischargers of storm

25 water associated with industrial activity to develop and implement an adequate SWPPP no

26 later than October 1, 1992.

27    68.    Defendant has failed to develop and implement an adequate SWPPP for the

28 Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the

COMPLAINT
                                                    16

1   Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials without

2   appropriate best management practices; the continued exposure of significant quantities of

3   various materials to storm water flows; the continued exposure and tracking of waste resulting

4   from the operation or maintenance of vehicles at the site, including trucks and forklifts; the

5   failure to either treat storm water prior to discharge or to implement effective containment

6   practices; and the continued discharge of storm water pollutants from the Facility at levels in

7   excess of EPA benchmark values.

8        69.    Defendant has failed to update the Facility's SWPPP in response to the

9   analytical results of the Facility's storm water monitoring.

10       70.    Each day since October 1, 1992 that Defendant has failed to develop, implement

11  and update an adequate SWPPP for the Facility is a separate and distinct violation of the

12  General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

13       71.    Defendant has been in violation of the SWPPP requirements every day since

14  October 1, 1992. Defendant continues to be in violation of the SWPPP requirements each day

15  that it fails to develop and fully implement an adequate SWPPP for the Facility.

16                        **THIRD CAUSE OF ACTION**
17  **Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
    **(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

18       72.    Plaintiff re-alleges and incorporates Paragraphs 1-71, inclusive, as if fully set

19  forth herein.

20       73.    Section B of the General Permit requires dischargers of storm water associated

21  with industrial activity to have developed and be implementing a monitoring and reporting

22  program (including, *inter alia*, sampling and analysis of discharges) no later than October 1,

23  1992.

24       74.    Defendant has failed to develop and implement an adequate monitoring and

25  reporting program for the Facility. Defendant's ongoing failure to develop and implement

26  an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to

27  conduct monthly visual observations of the storm water discharge in January 2006 and

28  December 2006, and their failure to monitor storm water samples during the 2006-2007

COMPLAINT
                                    17

1    rainy season for aluminum and chemical oxygen demand.

2        75.    Each day since October 1, 1992 that Defendant has failed to develop and

3    implement an adequate monitoring and reporting program for the Facility in violation of the

4    General Permit is a separate and distinct violation of the General Permit and Section 301(a)

5    of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results

6    are ongoing and continuous violations of the Act.

7                        **FOURTH CAUSE OF ACTION**
                    **Discharges of Contaminated Storm Water**
8            **in Violation of Permit Conditions and the Act**
                 **(Violations of 33 U.S.C. §§ 1311(a), 1342)**
9

10       76.    Plaintiff re-alleges and incorporates Paragraphs 1-75, inclusive, as if fully set

     forth herein.
11

12       77.    Discharge Prohibition A(2) of the General Permit requires that storm water

13   discharges and authorized non-storm water discharges shall not cause or threaten to cause

     pollution, contamination, or nuisance. Receiving Water Limitations C(1) and C(2) of the
14
     General Permit require that storm water discharges and authorized non-storm water discharges
15
     shall not adversely impact human health or the environment, and shall not cause or contribute
16
     to a violation of any water quality standards contained in a Statewide Water Quality Control
17
     Plan or the applicable Regional Board's Basin Plan.
18

19       78.    Plaintiff is informed and believes, and thereupon alleges, that since at least April

20   29, 2003, Defendant has been discharging polluted storm water from the Facility directly to

     channels that flow into the Mokelumne River, San Joaquin River, and Delta, in violation of
21
     the Discharge Prohibition A(2) of the General Permit.
22

23       79.    During every rain event, rainwater flows freely over exposed materials, waste

     products, and other accumulated pollutants at the Facility, becoming contaminated with these
24
     pollutants. The rainwater then flows untreated from the Facility into creeks adjacent to the
25
     Facility. This contaminated storm water then flows into the Mokelumne River, San Joaquin
26
     River, and Delta.
27

28       80.    Plaintiff is informed and believes, and thereupon alleges, that these discharges

COMPLAINT
                                         18

1  of contaminated storm water are adversely affecting human health and the environment in
2  violation of Receiving Water Limitation C(1) of the General Permit.

3     81.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of
4  contaminated storm water are contributing to the violation of the applicable water quality
5  standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's
6  Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

7     82.    Every day since at least April 29, 2003, that Defendant has discharged and
8  continues to discharge polluted storm water from the Facility in violation of the General Permit
9  is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These
10  violations are ongoing and continuous.

11                          **FIFTH CAUSE OF ACTION**
                   **False Certification of Compliance In Annual Report**
12        **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

13     83.    Plaintiff re-alleges and incorporates Paragraphs 1-82, as if fully set forth
14  herein.

15     84.    Defendant has falsely certified compliance with the General Permit in each of
16  the annual reports submitted to the Regional Board since at least June 21, 2004.

17     85.    Each day since at least June 21, 2004 that Defendant has falsely certified
18  compliance with the General Permit is a separate and distinct violation of the General Permit
19  and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of
20  the General Permit's certification requirement each day that it maintains its false certification
21  of its compliance with the General Permit.

22  **VII.   RELIEF REQUESTED**

23        Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

24        a.  Declare Defendant to have violated and to be in violation of the Act as
25  alleged herein;

26        b.  Enjoin Defendant from discharging polluted storm water from the Facility
27  unless authorized by the Permit;

28        c.  Enjoin Defendant from further violating the substantive and procedural

COMPLAINT
                                        19

1   requirements of the Permit;

2        d.  Order Defendant to immediately implement storm water pollution control
3   and treatment technologies and measures that are equivalent to BAT or BCT and prevent
4   pollutants in the Facility's storm water from contributing to violations of any water quality
5   standards;

6        e.  Order Defendant to comply with the Permit's monitoring and reporting
7   requirements, including ordering supplemental monitoring to compensate for past monitoring
8   violations;

9        f.  Order Defendant to prepare a SWPPP consistent with the Permit's
10  requirements and implement procedures to regularly review and update the SWPPP;

11       g.  Order Defendant to provide Plaintiff with reports documenting the quality
12  and quantity of their discharges to waters of the United States and their efforts to comply with
13  the Act and the Court's orders;

14       h.  Order Defendant to pay civil penalties of $27,500 per day per violation for
15  all violations occurring before March 15, 2004, and $32,500 per day per violation for all
16  violations occurring after March 15, 2004, for each violation of the Act pursuant to Sections
17  309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

18       i.  Order Defendant to take appropriate actions to restore the quality of waters
19  impaired or adversely affected by their activities;

20       j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness,
21  compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

22       k.  Award any such other and further relief as this Court may deem appropriate.

23  Dated: September 16, 2008         Respectfully submitted,

24                                   LOZEAU DRURY LLP

25

26                                   By:   _Douglas J. Chermak_
27                                         Douglas J. Chermak
                                           Attorneys for Plaintiff
28                                         CALIFORNIA SPORTFISHING PROTECTION
                                           ALLIANCE

COMPLAINT
                                   20

# EXHIBIT A

## California Sportfishing Protection Alliance

*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

April 28, 2008

Douglas Sobey, President
Troy Todd, District Manager
Central Valley Waste Services, Inc.
1333 E. Turner Road
Lodi, CA  95240

Waste Management of California, Inc.
1001 Fannin, Suite 4000
Houston, TX  77002

**Re:   Notice of Violations and Intent to File Suit Under the Federal Water
Pollution Control Act**

Dear Messrs. Sobey and Todd:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in
regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at Central
Valley Waste Services located at 1333 E. Turner Road in Lodi, California ("Facility").  CSPA is
a non-profit public benefit corporation dedicated to the preservation, protection, and defense of
the environment, wildlife, and natural resources of the San Joaquin River, the Sacramento-San
Joaquin River Delta (the "Delta"), and other California waters. This letter is being sent to you as
the responsible owners, officers, or operators of Central Valley Waste Services (all recipients are
hereinafter collectively referred to as "CVWS").

This letter addresses CVWS's unlawful discharge of pollutants from the Facility into the
City of Lodi storm drain system, the Mokelumne River, and the San Joaquin River and Delta.
The facility is discharging storm water pursuant to National Pollutant Discharge Elimination
System ("NPDES") Permit No. CA S000001, State Water Resources Control Board, Order No.
92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit"). The WDID
identification number for the Facility listed on documents submitted to the State Water
Resources Control Board ("State Board") and California Regional Water Quality Control Board,
Central Valley Region ("Regional Board") is 5S39I002193. The Facility is engaged in ongoing
violations of the substantive and procedural requirements of the General Permit.

Central Valley Waste Services
April 28, 2008
Page 2 of 16

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, CVWS is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against CVWS, Waste Management, Inc., Troy Todd, and Douglas Sobey under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below.

## I.    Background.

On March 16, 1998, CVWS filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). CVWS certified that the Facility is classified under SIC code 4953 ("refuse systems"). The Facility collects and discharges storm water from its eighteen acre industrial site into at least three storm drain outlets located at the facility. Based on information and belief, the storm water discharged by CVWS to those drains is then discharged to the City of Lodi storm drain system, which empties into the Mokelumne River, the San Joaquin River, and the Delta. The Regional Board has identified waters of the Lower Mokelumne River as failing to meet applicable water quality standards for copper and zinc and the waters of the San Joaquin River (from the Stanislaus River to the Delta Boundary) as failing to meet applicable water quality standards for boron, pesticides, electrical conductivity, mercury, and toxaphene. *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/docs/303dlists2006/pro5draft303d.pdf

The Regional Board has identified beneficial uses of the Central Valley region's waters and established water quality standards for the San Joaquin River, the Delta and their tributaries, including the Mokelumne River, in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan. *See* http://www.waterboards.ca.gov/centralvalley/water_issues/basin_plans/sacsjr.pdf. The beneficial uses of the San Joaquin River, the Delta and their tributaries, including the Mokelumne River, include among others water contact recreation, non-contact water recreation, municipal and domestic water supply, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, . . ., camping, boating, . . ., hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Basin Plan at II-1.00 – II-2.00. Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Mokelumne River, the San Joaquin River and Delta for contact and non-contact water recreation.

Notice of Violations and Intent to File Suit

# EXHIBIT B (3 OF 3)

Central Valley Waste Services
April 28, 2008
Page 3 of 16

The Basin Plan also establishes water quality standards for the San Joaquin River, the Delta and their tributaries, including the Mokelumne River. It includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." *Id.* at III-8.01. For the Delta, the Basin Plan establishes trace element water quality objectives for several metals, including 0.3 mg/L for zinc. *Id.* at III-4.00. The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses." *Id.* at III-6.00. The Basin Plan strictly limits increases in turbidity in Central Valley waters. *Id.* at III-9.00. The Basin Plan establishes a dissolved oxygen standard of 7.0 mg/L for the Sacramento River and Delta waters, and 6.0 mg/L for the San Joaquin River. *Id.* at III-5.00. The Basin Plan establishes a standard for electrical conductivity in the San Joaquin River and Delta and the South Fork Mokelumne River of 0.45 mmhos/cm from April 1 through August 15, as well as less stringent standards for various low flow conditions.

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by CVWS: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil & grease ("O&G") – 15 mg/L, iron – 1.0 mg/L, aluminum – 0.75 mg/L, and chemical oxygen demand ("COD") – 120 mg/L. The State Board also has proposed adding a benchmark level to the General Permit for specific conductance (200 μmho/cm).

## II.    Alleged Violations of the NPDES Permit.

### A.    *Failure to Develop and Implement an Adequate Storm Water Monitoring Plan*

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and non-storm water discharges (Section B(3)). Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. *All* storm water discharge locations shall be sampled." (emphasis added). Section B(5)(c)(i) requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) further requires that "samples shall be analyzed for . . . [t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

Central Valley Waste Services
April 28, 2008
Page 4 of 16

### 1.    Failure to Sample and Analyze Representative Storm Water Discharge Samples Each Year

Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event." Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample...facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

On information and belief, CSPA alleges that CVWS has failed to sample and analyze two storm water samples each year that represent the quality and quantity of the facility's storm water discharges during each of the past five years, since at least April __, 2008. With the exception of one sample taken on March 25, 2004, which was taken from an actual storm water discharge point, and one sample taken on November 15, 2003, which was taken from a point that discharges to a sanitary sewer, every storm water sample taken by CVWS for the past five years was taken upstream of a clarifier and thus prior to the actual point of discharge. This sample location does not represent the quality or quantity of the actual storm water discharges, and CVWS has verified in each of its Annual Reports for the past five years that such samples are not representative of the water quality of discharges. CSPA alleges that CVWS has not identified samples that are representative of the Facility's storm water discharges. Each failure to collect at least one sample from at least two qualifying storm events each year constitutes a distinct and ongoing violation of Sections B(5) and B(7) of the General Permit.

### 2.    Failure to Analyze Storm Water Samples for All Required Parameters

Section B(c)(ii) requires discharges to analyze storm water discharge samples for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." The facility may eliminate testing for the pollutant only if it is not detected in significant quantities after two consecutive sampling events.

CSPA, on information and belief, alleges that CVWS has failed to consistently analyze its storm water discharges during the past five years for aluminum and chemical oxygen demand. During the 2003-2004, 2004-2005, and 2005-2006 rainy seasons, CVWS analyzed some of its storm water discharges (these are the non-representative storm water discharges described above) for aluminum and/or chemical oxygen demand. With the exception of one sample taken on October 19, 2004, every result for aluminum and chemical oxygen demand exceeded the EPA benchmark value for the respective pollutant. CVWS did not test for either pollutant in its storm water discharges for the 2006-2007 rainy season and failed to show that it did not detect either pollutant in significant quantities after two consecutive sampling events. CVWS' ongoing failure to analyze its storm water samples for these and other pollutants likely to be present in its storm water discharges constitutes ongoing violations of the Act.

Notice of Violations and Intent to File Suit

Central Valley Waste Services
April 28, 2008
Page 5 of 16

### 3.     Failure to Conduct Required Visual Observations of Storm Water and Non-Storm Water Discharges

Section B(3) of the General Permit requires all dischargers to visually observe authorized and unauthorized non-storm water discharges from their facilities quarterly throughout the year. Visual observations must document "the presence of any discolorations, stains, odors, floating materials, etc., as well as the source of any discharge." Records of observations must be maintained and the discharger must respond to eliminate unauthorized non-storm water discharges and to reduce pollutants in authorized non-storm water discharges. The discharger's SWPPP must also be modified accordingly.

Section B(4) of the General Permit requires all dischargers to visually observe storm water discharges from their facilities at least once per month during the wet season (October 1 – May 30). Visual observations must document the presence of any "floating and suspended material, oil and grease, discolorations, turbidity, odor, and source of any pollutants." Records of observations must be maintained and the discharger must respond to reduce or prevent future discharges of pollutants. The discharger's SWPPP must also be modified accordingly.

Based on a review of publicly available documents, CSPA is informed and believes that CVWS has consistently failed to conduct the visual observations required by Sections B(3) and B(4) of the General Permit. For example, CVWS failed to conduct monthly visual observations of the storm water discharge in January 2006 and December 2006. CVWS failed to conduct observations for unauthorized non-storm water discharges during the July – September and October – December quarters during 2003. In many other instances during the past five years, the Facility failed to sample or monitor storm water and non-storm water discharge locations based on general claims that no qualifying events occurred at the Facility. Each failure to conduct required visual observations constitutes a distinct and ongoing violation of Sections B(3) and B(4) of the General Permit.

### 4.     Liability for Continuous and Ongoing Failure to Implement an Adequate Monitoring and Reporting Program.

CSPA is informed and believes that CVWS' failure to implement an adequate monitoring program is evidenced by this pattern of missed sampling and observation opportunities. Each of CVWS' failures to comply with these mandatory monitoring requirements constitutes a separate and ongoing violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, CVWS is subject to penalties for these violations of the General Permit and the Act since April 28, 2003.

### B.     Discharges in Violation of the Permit.

CVWS has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with

industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the
General Permit requires dischargers to reduce or prevent pollutants in their storm water
discharges through implementation of BAT for toxic and nonconventional pollutants and BCT
for conventional pollutants. BAT and BCT include both nonstructural and structural measures.
General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen
demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic
or nonconventional. *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of
materials other than storm water (defined as non-storm water discharges) that discharge either
directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General
Permit prohibits storm water discharges and authorized non-storm water discharges that cause or
threaten to cause pollution, contamination or nuisance.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges
and authorized non-storm water discharges to surface or groundwater that adversely impact
human health or the environment. Receiving Water Limitation C(2) of the General Permit also
prohibits storm water discharges and authorized non-storm water discharges that cause or
contribute to an exceedance of any applicable water quality standards contained in a Statewide
Water Quality Control Plan or the applicable Regional Board's Basin Plan.

On information and belief, CSPA alleges that CVWS has discharged and continues to
discharge storm water with unacceptable levels of TSS, specific conductivity, O&G, iron,
aluminum, COD and other pollutants in violation of the General Permit. CVWS's sampling and
analysis results reported to the Regional Board indicate potential discharges of specific
pollutants and materials other than storm water in violation of the Permit provisions listed above.
Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a
permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following levels of pollutants in storm water samples analyzed by the Facility are
evidence of ongoing violations of Discharge Prohibitions A(1) and A(2), Receiving Water
Limitations C(1) and C(2), and Effluent Limitation B(3) of the General Industrial Storm Water
Permit.

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|---|---|---|---|---|
| 12/21/2006 | Total Suspended Solids | 950 mg/L | 100 mg/L | Site B SW of Transfer Station |
| 12/21/2006 | Specific Conductivity | 809 µmho/cm | 200 µmho/cm (proposed) | Site B SW of Transfer Station |
| 12/21/2006 | Oil & Grease | 26 mg/L | 15 mg/L | Site B SW of Transfer Station |

Central Valley Waste Services
April 28, 2008
Page 7 of 16

| 12/21/2006 | Iron | 38.2 mg/L | 1.0 mg/L | Site B SW of Transfer Station |
|---|---|---|---|---|
| 12/21/2006 | Total Suspended Solids | 210 mg/L | 100 mg/L | Site C SE of Transfer Station |
| 12/21/2006 | Iron | 7.33 mg/L | 1.0 mg/L | Site C SE of Transfer Station |
| 1/30/2006 | Iron | 5.56 mg/L | 1.0 mg/L | Site A West of Gate #4 |
| 1/30/2006 | Aluminum | 4.3 mg/L | 0.75 mg/L | Site A West of Gate #4 |
| 1/30/2006 | Total Suspended Solids | 770 mg/L | 100 mg/L | Site B Gate #3 |
| 1/30/2006 | Specific Conductivity | 432 µmho/cm | 200 µmho/cm (proposed) | Site B Gate #3 |
| 1/30/2006 | Oil & Grease | 25 mg/L | 15 mg/L | Site B Gate #3 |
| 1/30/2006 | Iron | 24.3 mg/L | 1.0 mg/L | Site B Gate #3 |
| 1/30/2006 | Aluminum | 18.4 mg/L | 0.75 mg/L | Site B Gate #3 |
| 1/30/2006 | Total Suspended Solids | 150 mg/L | 100 mg/L | Site C Gate #1 |
| 1/30/2006 | Iron | 4.47 mg/L | 1.0 mg/L | Site C Gate #1 |
| 1/30/2006 | Aluminum | 3.3 mg/L | 0.75 mg/L | Site C Gate #1 |
| 10/19/2004 | Total Suspended Solids | 150 mg/L | 100 mg/L | E. of Gate #4 |
| 10/19/2004 | Iron | 5.84 mg/L | 1.0 mg/L | E. of Gate #4 |
| 10/19/2004 | Aluminum | 4.7 mg/L | 0.75 mg/L | E. of Gate #4 |
| 10/19/2004 | Chemical Oxygen Demand | 180 mg/L | 120 mg/L | E. of Gate #4 |
| 10/19/2004 | Iron | 1.74 mg/L | 1.0 mg/L | Main Office Gate #1 |
| 10/19/2004 | Aluminum | 1.5 mg/L | 0.75 mg/L | Main Office Gate #1 |
| 10/19/2004 | Total Suspended Solids | 580 mg/L | 100 mg/L | Gate #3 |
| 10/19/2004 | Specific Conductivity | 277 µmho/cm | 200 µmho/cm (proposed) | Gate #3 |
| 10/19/2004 | Oil & Grease | 22 mg/L | 15 mg/L | Gate #3 |
| 10/19/2004 | Iron | 17.5 mg/L | 1.0 mg/L | Gate #3 |
| 10/19/2004 | Aluminum | 14.4 mg/L | 0.75 mg/L | Gate #3 |
| 10/19/2004 | Chemical Oxygen Demand | 1,140 mg/L | 120 mg/L | Gate #3 |
| 3/25/2004 | Total Suspended Solids | 130 mg/L | 100 mg/L | West Side of MRF at Manhole |

Notice of Violations and Intent to File Suit

Central Valley Waste Services
April 28, 2008
Page 8 of 16

| 3/25/2004 | Iron | 3.21 mg/L | 1.0 mg/L | West Side of MRF at Manhole |
|-----------|------|-----------|----------|------------------------------|
| 3/25/2004 | Chemical Oxygen Demand | 330 mg/L | 120 mg/L | West Side of MRF at Manhole |
| 3/25/2004 | Total Suspended Solids | 1,000 mg/L | 100 mg/L | East Side of Transfer Station |
| 3/25/2004 | Iron | 31.7 mg/L | 1.0 mg/L | East Side of Transfer Station |
| 3/25/2004 | Chemical Oxygen Demand | 1,670 mg/L | 120 mg/L | East Side of Transfer Station |
| 3/25/2004 | Total Suspended Solids | 140 mg/L | 100 mg/L | South of Maint. Shop |
| 3/25/2004 | Iron | 6.62 mg/L | 1.0 mg/L | South of Maint. Shop |
| 3/25/2004 | Chemical Oxygen Demand | 600 mg/L | 120 mg/L | South of Maint. Shop |
| 11/15/2003 | Total Suspended Solids | 2,000 mg/L | 100 mg/L | Site A – Transfer Station NW of Scale House |
| 11/15/2003 | Specific Conductivity | 1,230 µmho/cm | 200 µmho/cm (proposed) | Site A – Transfer Station NW of Scale House |
| 11/15/2003 | Oil & Grease | 21 mg/L | 15 mg/L | Site A – Transfer Station NW of Scale House |
| 11/15/2003 | Iron | 54.3 mg/L | 1.0 mg/L | Site A – Transfer Station NW of Scale House |

CSPA's investigation, including its review of CVWS's analytical results documenting pollutant levels in the Facility's storm water samples well in excess of EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that CVWS has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, O&G, iron, aluminum, chemical oxygen demand and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. CVWS was required to have implemented BAT and BCT by no later than October 1, 1992. On information and belief, CSPA alleges that the clarifier and other measures employed by CVWS do not represent BAT and BCT for the Facility. CSPA alleges that CVWS is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT. In addition, CSPA alleges that the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every significant rain event that has occurred since April 28, 2003, and that will

Notice of Violations and Intent to File Suit

Central Valley Waste Services
April 28, 2008
Page 9 of 16

occur at the Facility subsequent to the date of this Notice of Violations and Intent to File Suit.
Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges
that CVWS has discharged storm water containing impermissible levels of TSS, specific
conductivity, O&G, iron, aluminum, chemical oxygen demand and other pollutants in violation
of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water
Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water
to each storm drain at or adjacent to the Facility containing any of these pollutants constitutes a
separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the
five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the
federal Clean Water Act, CVWS is subject to penalties for violations of the General Permit and
the Act since April 28, 2003.

### C. Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require
dischargers of storm water associated with industrial activity to develop, implement, and update
an adequate SWPPP no later than October 1, 1992. Section A(1) and Provision E(2) requires
dischargers who submitted an NOI pursuant to the General Permit to continue following their
existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but
in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants
associated with industrial activities that may affect the quality of storm and non-storm water
discharges from the facility and identify and implement site-specific best management practices
("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and
authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must
include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must
include: a description of individuals and their responsibilities for developing and implementing
the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm
water drainage areas with flow pattern and nearby water bodies, the location of the storm water
collection, conveyance and discharge system, structural control measures, impervious areas,
areas of actual and potential pollutant contact, and areas of industrial activity (General Permit,
Section A(4)); a list of significant materials handled and stored at the site (General Permit,
Section A(5)); a description of potential pollutant sources including industrial processes,
material handling and storage areas, dust and particulate generating activities, a description of
significant spills and leaks, a list of all non-storm water discharges and their sources, and a
description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility
and a description of the BMPs to be implemented at the Facility that will reduce or prevent
pollutants in storm water discharges and authorized non-storm water discharges, including
structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7),

Notice of Violations and Intent to File Suit

Central Valley Waste Services
April 28, 2008
Page 10 of 16

(8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's CVWS's Annual Reports indicate that CVWS has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. CVWS has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. CVWS has been in continuous violation of Section A and Provision E(2) of the General Permit every day since at least April 28, 2003, and will continue to be in violation every day that CVWS fails to develop and implement an effective SWPPP. CVWS is subject to penalties for violations of the Order and the Act occurring since April 28, 2003.

### D.    Failure to File True and Correct Annual Reports.

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

For at least the last five years, CVWS and its agents, Troy Todd, Pat Fenton, and Luana A. Pinasco, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, CVWS and Troy Todd have violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time CVWS or its agent failed to submit a complete or correct report and every time CVWS or its agents falsely purported to comply with the Act. CVWS is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since April 28, 2003.

## IV.    Persons Responsible for the Violations.

CSPA puts CVWS, Waste Management, Inc., Troy Todd, and Douglas Sobey on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts CVWS, Waste Management, Inc., Troy Todd, and Douglas Sobey on notice that it intends to include those subsequently identified persons in this action.

Central Valley Waste Services
April 28, 2008
Page 11 of 16

## V.    Name and Address of Noticing Party.

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067

## VI.    Counsel.

CSPA has retained legal counsel to represent it in this matter. Please direct all
communications to:

Michael R. Lozeau                                Andrew L. Packard
Douglas J. Chermak                               Law Offices of Andrew L. Packard
Law Office of Michael R. Lozeau                  319 Pleasant Street
1516 Oak Street, Suite 216                       Petaluma, California 94952
Alameda, California 94501                        Tel. (707) 763-7227
Tel. (510) 749-9102                              andrew@packardlawoffices.com
mrlozeau@lozeaulaw.com

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil
Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects
CVWS to a penalty of up to $32,500 per day per violation for all violations occurring during the
period commencing five years prior to the date of this Notice of Violations and Intent to File
Suit. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations
of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief
as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing
parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds
for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against CVWS and
its agents for the above-referenced violations upon the expiration of the 60-day notice period.
However, during the 60-day notice period, we would be willing to discuss effective remedies for
the violations noted in this letter. If you wish to pursue such discussions in the absence of
litigation, we suggest that you initiate those discussions within the next 20 days so that they may
be completed before the end of the 60-day notice period. We do not intend to delay the filing of

Notice of Violations and Intent to File Suit

Central Valley Waste Services
April 28, 2008
Page 12 of 16

a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

> cc:   CT Corporation, Agent of Service of Process for Waste Management of
>        California, Inc. (C0266196)

Notice of Violations and Intent to File Suit

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dorothy Rice, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Michael Mukasey, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA 94105

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA  95670-6114

ATTACHMENT A
Rain Dates, CVWS, Lodi, CA

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| April | 24 | 2003 | | December | 24 | 2003 | | October | 19 | 2004 |
| April | 25 | 2003 | | December | 25 | 2003 | | October | 20 | 2004 |
| April | 27 | 2003 | | December | 28 | 2003 | | October | 21 | 2004 |
| April | 28 | 2003 | | December | 29 | 2003 | | October | 22 | 2004 |
| April | 29 | 2003 | | January | 01 | 2004 | | October | 23 | 2004 |
| May | 02 | 2003 | | January | 02 | 2004 | | October | 24 | 2004 |
| May | 03 | 2003 | | January | 04 | 2004 | | October | 25 | 2004 |
| May | 08 | 2003 | | January | 06 | 2004 | | October | 26 | 2004 |
| August | 21 | 2003 | | January | 07 | 2004 | | October | 28 | 2004 |
| August | 22 | 2003 | | January | 08 | 2004 | | October | 31 | 2004 |
| August | 26 | 2003 | | January | 09 | 2004 | | November | 03 | 2004 |
| October | 31 | 2003 | | January | 11 | 2004 | | November | 04 | 2004 |
| November | 01 | 2003 | | January | 14 | 2004 | | November | 05 | 2004 |
| November | 02 | 2003 | | January | 21 | 2004 | | November | 07 | 2004 |
| November | 03 | 2003 | | January | 23 | 2004 | | November | 10 | 2004 |
| November | 06 | 2003 | | January | 24 | 2004 | | November | 11 | 2004 |
| November | 07 | 2003 | | January | 27 | 2004 | | November | 12 | 2004 |
| November | 08 | 2003 | | January | 30 | 2004 | | November | 13 | 2004 |
| November | 09 | 2003 | | February | 02 | 2004 | | November | 14 | 2004 |
| November | 14 | 2003 | | February | 03 | 2004 | | November | 15 | 2004 |
| November | 15 | 2003 | | February | 06 | 2004 | | November | 25 | 2004 |
| November | 16 | 2003 | | February | 07 | 2004 | | November | 27 | 2004 |
| November | 17 | 2003 | | February | 13 | 2004 | | December | 02 | 2004 |
| November | 19 | 2003 | | February | 15 | 2004 | | December | 06 | 2004 |
| November | 30 | 2003 | | February | 16 | 2004 | | December | 07 | 2004 |
| December | 01 | 2003 | | February | 17 | 2004 | | December | 08 | 2004 |
| December | 02 | 2003 | | February | 18 | 2004 | | December | 10 | 2004 |
| December | 03 | 2003 | | February | 21 | 2004 | | December | 11 | 2004 |
| December | 04 | 2003 | | February | 22 | 2004 | | December | 16 | 2004 |
| December | 05 | 2003 | | February | 24 | 2004 | | December | 17 | 2004 |
| December | 06 | 2003 | | February | 25 | 2004 | | December | 18 | 2004 |
| December | 07 | 2003 | | February | 26 | 2004 | | December | 20 | 2004 |
| December | 08 | 2003 | | March | 02 | 2004 | | December | 23 | 2004 |
| December | 09 | 2003 | | March | 08 | 2004 | | December | 27 | 2004 |
| December | 10 | 2003 | | March | 11 | 2004 | | December | 28 | 2004 |
| December | 12 | 2003 | | March | 12 | 2004 | | December | 29 | 2004 |
| December | 13 | 2003 | | March | 13 | 2004 | | December | 30 | 2004 |
| December | 14 | 2003 | | March | 14 | 2004 | | December | 31 | 2004 |
| December | 15 | 2003 | | March | 15 | 2004 | | January | 01 | 2005 |
| December | 19 | 2003 | | March | 17 | 2004 | | January | 02 | 2005 |
| December | 20 | 2003 | | June | 07 | 2004 | | January | 03 | 2005 |
| December | 22 | 2003 | | October | 17 | 2004 | | January | 04 | 2005 |
| December | 23 | 2003 | | October | 18 | 2004 | | January | 07 | 2005 |

Notice of Violations and Intent to File Suit

**ATTACHMENT A**
**Rain Dates, CVWS, Lodi, CA**

| Month | Day | Year | Month | Day | Year | Month | Day | Year |
|---|---|---|---|---|---|---|---|---|
| January | 08 | 2005 | March | 23 | 2005 | January | 06 | 2006 |
| January | 09 | 2005 | March | 27 | 2005 | January | 07 | 2006 |
| January | 10 | 2005 | March | 28 | 2005 | January | 11 | 2006 |
| January | 11 | 2005 | March | 29 | 2005 | January | 12 | 2006 |
| January | 12 | 2005 | April | 03 | 2005 | January | 14 | 2006 |
| January | 13 | 2005 | April | 08 | 2005 | January | 17 | 2006 |
| January | 24 | 2005 | April | 09 | 2005 | January | 18 | 2006 |
| January | 25 | 2005 | April | 23 | 2005 | January | 19 | 2006 |
| January | 26 | 2005 | May | 04 | 2005 | January | 20 | 2006 |
| January | 27 | 2005 | May | 08 | 2005 | January | 21 | 2006 |
| January | 28 | 2005 | May | 09 | 2005 | January | 24 | 2006 |
| January | 30 | 2005 | May | 19 | 2005 | January | 25 | 2006 |
| January | 31 | 2005 | June | 08 | 2005 | January | 26 | 2006 |
| February | 01 | 2005 | June | 09 | 2005 | January | 27 | 2006 |
| February | 03 | 2005 | June | 16 | 2005 | January | 28 | 2006 |
| February | 04 | 2005 | October | 15 | 2005 | January | 29 | 2006 |
| February | 07 | 2005 | October | 28 | 2005 | January | 30 | 2006 |
| February | 10 | 2005 | November | 04 | 2005 | February | 03 | 2006 |
| February | 11 | 2005 | November | 08 | 2005 | February | 04 | 2006 |
| February | 13 | 2005 | November | 12 | 2005 | February | 09 | 2006 |
| February | 14 | 2005 | November | 25 | 2005 | February | 10 | 2006 |
| February | 15 | 2005 | November | 27 | 2005 | February | 12 | 2006 |
| February | 16 | 2005 | November | 28 | 2005 | February | 14 | 2006 |
| February | 17 | 2005 | December | 01 | 2005 | February | 17 | 2006 |
| February | 18 | 2005 | December | 02 | 2005 | February | 18 | 2006 |
| February | 19 | 2005 | December | 05 | 2005 | February | 20 | 2006 |
| February | 20 | 2005 | December | 15 | 2005 | February | 26 | 2006 |
| February | 21 | 2005 | December | 17 | 2005 | February | 27 | 2006 |
| February | 27 | 2005 | December | 18 | 2005 | February | 28 | 2006 |
| March | 01 | 2005 | December | 19 | 2005 | March | 02 | 2006 |
| March | 02 | 2005 | December | 21 | 2005 | March | 03 | 2006 |
| March | 03 | 2005 | December | 22 | 2005 | March | 05 | 2006 |
| March | 04 | 2005 | December | 23 | 2005 | March | 06 | 2006 |
| March | 05 | 2005 | December | 25 | 2005 | March | 07 | 2006 |
| March | 07 | 2005 | December | 26 | 2005 | March | 10 | 2006 |
| March | 08 | 2005 | December | 27 | 2005 | March | 12 | 2006 |
| March | 09 | 2005 | December | 28 | 2005 | March | 13 | 2006 |
| March | 10 | 2005 | December | 29 | 2005 | March | 14 | 2006 |
| March | 11 | 2005 | December | 30 | 2005 | March | 16 | 2006 |
| March | 12 | 2005 | December | 31 | 2005 | March | 17 | 2006 |
| March | 19 | 2005 | January | 01 | 2006 | March | 20 | 2006 |
| March | 20 | 2005 | January | 02 | 2006 | March | 24 | 2006 |
| March | 21 | 2005 | January | 03 | 2006 | March | 25 | 2006 |
| March | 22 | 2005 | January | 05 | 2006 | March | 27 | 2006 |

Notice of Violations and Intent to File Suit

ATTACHMENT A
Rain Dates, CVWS, Lodi, CA

| March | 28 | 2006 |
|---|---|---|
| March | 29 | 2006 |
| March | 30 | 2006 |
| March | 31 | 2006 |
| April | 02 | 2006 |
| April | 03 | 2006 |
| April | 04 | 2006 |
| April | 05 | 2006 |
| April | 07 | 2006 |
| April | 09 | 2006 |
| April | 10 | 2006 |
| April | 11 | 2006 |
| April | 12 | 2006 |
| April | 16 | 2006 |
| May | 19 | 2006 |
| May | 21 | 2006 |
| May | 22 | 2006 |
| October | 01 | 2006 |
| October | 04 | 2006 |
| October | 05 | 2006 |
| October | 06 | 2006 |
| November | 01 | 2006 |
| November | 02 | 2006 |
| November | 03 | 2006 |
| November | 04 | 2006 |
| November | 08 | 2006 |
| November | 11 | 2006 |
| November | 12 | 2006 |
| November | 13 | 2006 |
| November | 14 | 2006 |
| November | 15 | 2006 |
| November | 16 | 2006 |
| November | 18 | 2006 |
| November | 24 | 2006 |
| November | 25 | 2006 |
| November | 26 | 2006 |
| November | 27 | 2006 |
| November | 28 | 2006 |
| November | 29 | 2006 |
| November | 30 | 2006 |
| December | 08 | 2006 |

| December | 09 | 2006 |
|---|---|---|
| December | 10 | 2006 |
| December | 11 | 2006 |
| December | 12 | 2006 |
| December | 13 | 2006 |
| December | 14 | 2006 |
| December | 16 | 2006 |
| December | 17 | 2006 |
| December | 18 | 2006 |
| December | 19 | 2006 |
| December | 20 | 2006 |
| December | 21 | 2006 |
| December | 22 | 2006 |
| December | 29 | 2006 |
| December | 30 | 2006 |
| December | 31 | 2006 |
| January | 06 | 2007 |
| January | 07 | 2007 |
| January | 08 | 2007 |
| January | 09 | 2007 |
| January | 10 | 2007 |
| January | 27 | 2007 |
| January | 28 | 2007 |
| January | 29 | 2007 |
| January | 31 | 2007 |
| February | 07 | 2007 |
| February | 08 | 2007 |
| February | 09 | 2007 |
| February | 10 | 2007 |
| February | 11 | 2007 |
| February | 12 | 2007 |
| February | 22 | 2007 |
| February | 24 | 2007 |
| February | 25 | 2007 |
| February | 26 | 2007 |
| February | 27 | 2007 |
| February | 28 | 2007 |
| March | 20 | 2007 |
| March | 21 | 2007 |
| March | 26 | 2007 |
| April | 11 | 2007 |

| April | 12 | 2007 |
|---|---|---|
| April | 18 | 2007 |
| May | 01 | 2007 |
| May | 08 | 2007 |
| July | 11 | 2007 |
| September | 22 | 2007 |
| October | 10 | 2007 |
| October | 12 | 2007 |
| October | 13 | 2007 |
| October | 16 | 2007 |
| October | 17 | 2007 |
| October | 31 | 2007 |
| November | 01 | 2007 |
| November | 10 | 2007 |
| November | 11 | 2007 |
| November | 14 | 2007 |
| November | 17 | 2007 |
| November | 18 | 2007 |
| November | 23 | 2007 |
| January | 14 | 2008 |
| January | 15 | 2008 |
| January | 21 | 2008 |
| January | 22 | 2008 |
| January | 23 | 2008 |
| January | 24 | 2008 |
| January | 26 | 2008 |
| January | 27 | 2008 |
| January | 29 | 2008 |
| January | 31 | 2008 |
| February | 02 | 2008 |
| February | 03 | 2008 |
| February | 11 | 2008 |
| February | 19 | 2008 |
| February | 21 | 2008 |
| February | 22 | 2008 |
| February | 23 | 2008 |
| February | 24 | 2008 |
| March | 15 | 2008 |
| March | 28 | 2008 |

Notice of Violations and Intent to File Suit